## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | **Case No. 08-00802-TLM** |
| **AARON MICHAEL HYMAS and** | ) | |
| **TIFFANY KIM HYMAS,** | ) | |
| | ) | **Chapter 7** |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| **UNITED STATES TRUSTEE,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Adv. No. 08-06096-TLM** |
| | ) | |
| **AARON MICHAEL HYMAS and** | ) | |
| **TIFFANY KIM HYMAS,** | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

### MEMORANDUM OF DECISION
_____

## INTRODUCTION

The United States Trustee ("UST") brought this adversary proceeding

seeking to deny Aaron and Tiffany Hymas ("Debtors") their discharges under

§ 727(a)(2), (4) and (6).  In June, 2010, the Court conducted a three and a half day

trial.  *See* Adv. Doc. Nos. 55-58 (minute entries), 60-63 (trial transcripts).  The

parties submitted written closing arguments and the matter was taken under

MEMORANDUM OF DECISION - 1

advisement on July 30.  The following constitutes the Court's findings of fact and conclusions of law.  *See* Fed. R. Bankr. P. 7052.

**FACTS**[1]

### A.   Debtors' personal and business background

Debtors have been married 15 years.  Aaron Hymas earned a bachelor degree in human resources and Tiffany earned an associate degree in business.[2] Both Debtors took accounting classes in college and appeared to the Court to be intelligent individuals.

Over the course of their marriage, Debtors held interests in several different entities.  Among these entities, Debtors, along with another couple – Justin and Jackie Walker[3] – held interests in OPM Enterprises, Inc., a property management company, and Crestwood Construction, Inc., a construction company that specialized in building quality custom homes.[4]  Aaron and Justin operated these

---

[1]  All factual findings based on testimony reflect and incorporate the Court's evaluation of the credibility and veracity of the witnesses, the Court having carefully listened to and observed them during the trial, and also reflects the weight ascribed to their testimony.  This is true even where the Court does not make specific reference to credibility in addressing the facts.

[2]  The Court's reference to Debtors by their first names is done solely for clarity of the record.

[3]  Justin and Jackie Walker filed a chapter 7 bankruptcy petition at the same time Debtors filed their petition.  *See* Case No. 08-00804-TLM.

[4]  Crestwood Construction, Inc. was re-formed as Crestwood, Inc., in 2005.  For the purposes of this decision, the Court will generally refer to "Crestwood."

MEMORANDUM OF DECISION - 2

entities.[5]  Generally speaking, Aaron sold real properties (homes or lots) and

building plans to potential clients and worked with the contractors and the

subcontractors on a regular basis to construct homes.  Justin handled the financial

side of the businesses, including dealing with legal matters that arose.  These

businesses were quite successful and generated significant income for Debtors and

the Walkers.

In May, 2007, Aaron also acquired a 49% interest in Equity Benefits, LLC.

He had previously lent over $500,000.00 to a friend, Vince Covino, and in

exchange for forgiveness of that debt, Covino and his wife, Kimberly, consented

to the change in ownership of Equity Benefits, LLC.  *See* Ex. 151.  Equity

Benefits owned a parcel of commercial property in Boise, Idaho and another

parcel of property in Arizona.

### 1.    The decline of Crestwood

Crestwood specialized in building high-end custom homes primarily in the

Treasure Valley area of Idaho and in Utah.  Several of Crestwood's projects were

valued around or above one million dollars.  During 2007, Crestwood began to

experience financial difficulties when clients were unable to close on the homes

Crestwood had built for them.  In the fall, those difficulties became great enough

---

[5]  Tiffany had limited involvement with Crestwood.  She helped Aaron modify home plans and gave a different perspective to possible building projects and designs, but she did not work for the corporation or manage it.

MEMORANDUM OF DECISION - 3

that Debtors began contributing personal funds into the business and Justin set up

meetings with local bankruptcy practitioners regarding a possible chapter 11

petition on behalf of Crestwood.

Justin and Aaron met with several bankruptcy practitioners. They met first

with Blair Clark in early October, 2007, then with Howard Foley[6] and, finally,

with Kelly Beeman. Debtors, and the Walkers, had personally guaranteed a

number of Crestwood's debts, including large bank loans and supply contracts.

While the initial meetings with these attorneys were directed to the viability and

health of their corporation, Aaron and Justin discussed their potential personal

liability with Foley. Foley advised Aaron and Justin that, in his experience,

lenders typically look to their collateral, liquidate the collateral, and then make a

business decision as to whether to pursue any individual guarantors. While Foley

advised them that lenders often do not pursue guarantors, he did not tell them it

would not or could not happen.

Despite meeting with attorneys as early as October, 2007, Justin and Aaron

did not immediately file a bankruptcy petition for Crestwood. Instead, Crestwood

continued to operate. But the market continued to decline, Crestwood continued

to struggle, and the principals continued to infuse personal funds into the

---

[6] Foley ultimately represented Crestwood in its chapter 7 bankruptcy filed on July 9,
2008. *See* Ex. 111 (docket for Case No. 08-01350-TLM).

MEMORANDUM OF DECISION - 4

corporation.

Tiffany handled Debtors' personal finances. In order to get funds for Crestwood, Justin Walker would request them from her and she would write checks. While she did not control, and was not familiar with, Crestwood's finances, she knew as of August, 2007, that Debtors were expending personal funds to keep Crestwood's business going. She was also aware that her husband was working long hours attempting to sell homes that had not closed. During this time, Aaron was actively working to sell Crestwood's inventory either parcel by parcel or in larger quantities to investors. Although he had several meetings with investors, those sales did not occur.

### 2.   Asset protection seminar

Sometime in October, 2007, while Crestwood's future looked increasingly bleak, Aaron attended a seminar in Boise in which Nick Malis presented an asset protection strategy. Malis presented himself as a Nevada attorney, and he advocated the creation and use of Nevada entities to operate businesses and own properties. Through the use of trusts, limited liability limited partnerships ("LLLP"), limited liability companies ("LLC"), and self-directed IRAs, Malis advanced an approach that would allow an individual to "own nothing but control everything."

This was not the first time Aaron had heard about Nevada entity structures.

MEMORANDUM OF DECISION - 5

Approximately two years before, Crestwood had hired a consulting firm to
restructure Crestwood's operations. While that firm worked primarily with Justin,
Aaron was aware that it advocated use of Nevada entities for various tax and
liability purposes. Justin and Aaron discussed the idea of utilizing these structures
at that time, but did not want to invest the money to shift their corporation's
business practices. However, in October, 2007, Aaron was interested enough to
meet individually with Malis after the seminar and, within a few weeks, hire him
to form – for Debtors personally – a number of entities to provide the "layers of
protection" discussed at the seminar. Ex. 185 at 95.

### 3.    Initial liens and lawsuits

Also in the fall of 2007, both before and after Aaron attended the seminar
and hired Malis, various suppliers, subcontractors and banks initiated lawsuits
against Crestwood and Aaron[7] and filed liens on Crestwood's building projects.
For example, in late October, Allied Painters filed three mechanics liens for
$35,216.00, $37,606.00 and $19,281.25 on Crestwood properties in Utah. *See* Ex.
123. In November, Crestwood, Aaron and Justin stipulated to a $70,000.00
judgment in a pending case brought by Building Components of Idaho, Inc. *See*
Ex. 124. As part of the stipulation, Building Components agreed not to record the

---

[7]   The lawsuits were brought against Crestwood, Aaron and a number of other
defendants, including Justin Walker.

MEMORANDUM OF DECISION - 6

$70,000.00 judgment for three months.

### 4.    The Nevada entities

On December 4, 2007, Malis created a number of Nevada entities: Hymas Capital Group, Inc.; Hymas Ventures, LP; Hymas Ventures, LLLP; Hymas Holdings I, LLC; Hymas Holdings II, LLC; Hymas Holdings III, LLC; Hymas Holdings IV, LLC; Hymas Holdings V, LLC; and Hymas Holdings VI, LLC. *See* Ex. 161. These entities were all formed on behalf of Aaron and Tiffany Hymas. The Hymas Family Living Trust[8] was also established on December 4, 2007.

Hymas Ventures, LLLP owned Hymas Holdings I through VI. On December 7, 2007, Aaron transferred his 49% interest in Equity Benefits, LLC to Hymas Ventures, LLLP. *See* Ex. 151 at 2. Hymas Capital Group, Inc. was intended to be a 1% general partner in Hymas Ventures, LLLP with the Hymas Family Living Trust as a 98% limited partner and Aaron's brother Shane Hymas as a 1% limited partner. *See* Ex. 132.[9]

The first four Hymas Holding companies each had an intended purpose. Hymas Holdings I was initially intended to do business with Portella Homes,

---

[8]  The Hymas Family Living Trust is referenced at times as the Aaron and Tiffany Hymas Living Trust, *see* Exs. 136, 141. For the purposes of this Decision, the Court will refer to the Hymas Family Living Trust, as the majority of the documents appear to use that name. *See* Exs. 137, 140, 167.

[9]  While Hymas Capital Group, Inc. was intended to be the general partner in Hymas Ventures, LLLP, Aaron is listed as the general partner on the Certificate of Registration. *See* Ex. 161 at 7.

MEMORANDUM OF DECISION - 7

another real estate venture. Hymas Holdings II was intended to develop and fund an invention. Hymas Holdings III was intended to operate a surrogacy agency which Tiffany would run. Hymas Holdings IV was intended to operate and control Debtors' 50% interest in OPM Enterprises.

In addition to creating these entities, Debtors purchased Moland Associates, an established Nevada entity, from Malis. Tiffany intended to use Moland Associates to bill the Hymas Holding companies for her bookkeeping and accounting work for the various entities.

Toward the end of December, Aaron unsuccessfully attempted to contact Malis with some questions regarding the newly created Nevada entities. Unable to find Malis, Aaron contacted Jon Turner, an attorney listed on a business card Malis originally gave him. Upon contacting Turner, Aaron learned Malis was not an attorney, had previously worked for Turner but no longer did and, in fact, was in trouble with the law. Concerned over the legitimacy of the various entities Malis had established for Debtors, Aaron went to Nevada to meet Turner personally and discuss the situation.

Aaron hired Turner to review the entities Malis had created. Turner concluded the entities were legitimately established in Nevada, but advised Aaron that the Hymas Family Living Trust needed to be restated to reflect the Hymas'

MEMORANDUM OF DECISION - 8

desires.[10]

### 5.    Liquidating accounts and selling homes

Debtors liquidated an investment account with LPL Financial Services, withdrawing $50,000.00 in December, 2007, and another $97,724.47 in January, 2008.  *See* Ex. 179 at 26, 29, 30.  Debtors did not explain where these funds went.[11]  In addition to liquidating the LPL investment account, Debtors sold a home in Island Park, Idaho in late January, 2008.  They received well over $100,000.00 from the sale and deposited those funds into Tiffany's Spokane Teachers Credit Union ("STCU") account.[12]

### 6.    Funding the Nevada entities

Having confirmed with Turner that the Nevada entities were legitimately created, Debtors began "funding" them.  The bulk of the transfers occurred in February, 2008, and came out of Tiffany's STCU account where Debtors had deposited, among other funds, the proceeds from the sale of the Island Park home.

Throughout February, Debtors opened accounts for Hymas Holdings I, II

---

[10]  On February 1, 2008, upon Turner's advice, Debtors restated their trust.  *See* Ex. 140.

[11]  While Tiffany could not recall where either of the withdrawals from the LPL account went, it appears, from the reverse of the check, that the $50,000.00 December withdrawal was deposited into Debtors' US Bank checking account.  *See* Ex. 179 at 26; Ex. 174 at 10.

[12]  Debtors' testimony generally referred to a sum in excess of $100,000.00 from the Island Park home sale.  While no exact figure was given during trial, in response to discovery, Debtors provided the UST with a list of income showing $171,251.92 received from the sale of the Island Park home.  Ex. 182 at Ex. E p. 53.

MEMORANDUM OF DECISION - 9

and III, Hymas Ventures, LLLP and the Hymas Family Living Trust at Wells Fargo Bank. *See* Exs. 163, 164, 165, 166, and 167. While both Debtors signed the documents for the accounts, Tiffany set up the initial transfers and was in charge of the various transactions.

On February 19, 2008, Tiffany transferred, via a quitclaim deed, Debtors' residence on Sugar Loaf Way in Eagle, Idaho to Hymas Holdings I. *See* Ex. 143. The deed was recorded the next day. Debtors also transferred all their furniture and household items into Hymas Holdings I.

On February 21, 2008, a $100,000.00 transfer was completed from Tiffany's STCU account to Hymas Holdings I's Wells Fargo account. Ex. 178 at 9; Ex. 163 at 8. Tiffany also transferred from the STCU account $150,000.00 into Hymas Holdings III's Wells Fargo account (Ex. 178 at 9; Ex. 165 at 10) and $75,000.00 into Hymas Holdings II's Wells Fargo account (Ex. 178 at 9; Ex. 164 at 12).[13] Aaron testified that he placed funds in each entity upon the advice of counsel and the amount of funds was meant to reflect the type of business each entity would perform in the future.

Debtors further testified that the transferred funds came, in large part, from the sale of the Island Park residence and those funds were dispersed among their

---

[13]  In March, Aaron gave a detailed summary of these transfers to his attorney, Turner. *See* Ex. 154 at 2.

MEMORANDUM OF DECISION - 10

many new entities.  However, of the $325,000.00 transferred into the three entities

listed, the funds from the Island Park home sale could constitute no more than

half.  There was insufficient explanation regarding the source of the remaining

funds, other than they came out of Tiffany's STCU account.

### 7.      Lawsuits, liens and judgments continue

Contemporaneously with Debtors' several transfers, creditor collection

activity continued.  On February 12 and 19, 2008, Allied Painters initiated

lawsuits against Aaron, among others, on its October liens for labor and materials

provided to Crestwood in Utah.  Exs. 127, 128.  On February 19, 2008, the same

day Tiffany transferred Debtors' residence to Hymas Holdings I, and after the

agreed three-month delay in executing on its judgment, Building Components of

Idaho recorded its $70,000.00 stipulated judgment against Aaron in Ada County,

Idaho.  *See* Ex. 125.

The next day, on February 20, 2008, Bank of the West filed a

$1,335,827.51 lawsuit against Crestwood and Debtors.[14]  Ex. 131.  Aaron and

Tiffany were both served with the summons and complaint in that litigation on

February 25, 2008.  *Id.* at 146, 150.

On February 28, 2008, a default judgment against Aaron and in favor of

Contempo Ceramic Tile Corporation for over $60,000.00 was entered by the Third

---

[14]   The complaint lists numerous other parties, including Justin and Jackie Walker.

MEMORANDUM OF DECISION - 11

District Court of Salt Lake County for the State of Utah. *See* Ex. 129. Also in late February, Building Components of Idaho requested and received a writ of execution on its $70,000.00 stipulated judgment. *See* Ex. 126 at 5-6.

Upon receiving the Bank of the West complaint, Aaron realized that a personal bankruptcy was imminent, and Aaron and Justin again consulted with Beeman, whom they had first approached regarding a business bankruptcy for Crestwood. On February 29, 2008, Aaron and Justin retained Beeman to file personal bankruptcy petitions for Debtors and the Walkers. Beeman provided Aaron with paperwork for Debtors to complete and Aaron, in turn, gave that paperwork to Tiffany.

Thus, in late 2007 and early 2008, when Debtors transferred substantial cash and other assets to their newly created entities, they did so knowing they faced significant collection activities from numerous creditors. And, in February, both Debtors were aware that their personal bankruptcy was imminent.

### 8.    March and April activities

#### a.    March attorney discussions

In early March, Aaron informed Turner of Debtors' impending bankruptcy. Turner told Aaron he was not a bankruptcy attorney but expressed some concern over the newly created Nevada entities. In the end, Turner advised Aaron to rely on bankruptcy counsel. In response, on March 11, 2008, Aaron sent an e-mail

MEMORANDUM OF DECISION - 12

"introducing" Beeman and Turner, and asking the two attorneys to cooperate in order to "work[] together to help protect these entities and their assets throughout the Bankruptcy that unfortunately is coming."  *See* Ex. 155 at 4.

Aaron informed Beeman of the Hymas Family Living Trust and the many Nevada entities that had been formed or purchased as of early December. Throughout March, Aaron met with Beeman on a number of occasions to attempt to explain the entity structure that was created.  Finally, in late March, Aaron participated in a multi-party telephone conversation with Beeman and Turner regarding the structure of the entities.

### b.    More financial transactions

In the interim, Tiffany continued to set up accounts for the Nevada entities and transfer funds in and between the various accounts.  During March, Tiffany set up Wells Fargo Bank accounts for Moland Associates, Hymas Capital Group, Inc., and Hymas Holdings IV.  *See* Exs. 168, 169, and 170.  On March 3, 2008, Tiffany deposited $23,000.00 into the Hymas Family Living Trust account.  *See* Ex. 167 at 8.  On March 25, 2008, Debtors made an initial $20,000.00 deposit into Hymas Holdings IV's account from OPM Enterprises.  *See* Ex. 170 at 8, 10.  In mid-March, Debtors caused Hymas Holdings III to loan them $60,500.00 to pay for fertility treatments and set up an escrow account for their surrogate.  *See* Ex. 165 at 17.  Debtors did not repay that loan.  On March 27, 2008, Tiffany wrote a

MEMORANDUM OF DECISION - 13

$7,000.00 check out of her STCU account and deposited the same into the Moland

Associates' account.  *See* Ex. 178 at 15, 24; Ex. 168 at 7, 9.

In mid-April, Debtors sold Tiffany's wedding ring, worth over $5,000.00, a

pair of earrings and two watches to Aaron's parents for $13,000.00.  Ex. 162.

Around that same time, in contemplation of bankruptcy and based on Beeman's

advice, Tiffany withdrew from Hymas Holdings I the personal and household

items she deemed to be basic necessities to live.  Those items would be listed on

Debtors' bankruptcy schedules but claimed as exempt.  She left the assets in

Hymas Holdings I that Debtors would not be able to exempt in their bankruptcy.

### c.    Collections and default judgments continue

On March 21, 2008, Contempo Ceramic Tile filed their Utah judgment as a

foreign judgment in Ada County.  *See* Ex. 130.  Under Building Components of

Idaho's February writ of execution, Ada County Sheriff's deputies seized on April

1, 2008, Aaron's 2002 BMW 745.[15]

On April 17, 2008, a default judgment was entered for $1,366,001.74 plus

$18,367.50 of attorneys' fees and $684.00 of costs in the Bank of the West lawsuit

against Debtors as Crestwood's guarantors.  *See* Ex. 131 at 151.

-----

[15]  The vehicle was subsequently returned as it was already subject to a security interest
in favor of JP Morgan Chase Bank.  Ex. 126.

MEMORANDUM OF DECISION - 14

### d.      Purchase of Financial Alliance for Chiropractors

On April 11, 2008, Aaron caused Hymas Holdings I to enter, along with Vince Covino, into a stock purchase agreement to acquire 1,000 shares of stock in Financial Alliance for Chiropractors, Inc., an existing financial services/consulting company with a client base of chiropractors. Ex. 146. Hymas Holdings I and Covino agreed to purchase those shares for $468,000.00. *Id.* Aaron paid $220,000.00 from Hymas Holdings I (which had received funds from Hymas Holdings II; III; IV; Hymas Ventures, LLLP and Moland Associates, all of which had previously been funded by transfers from Debtors) to complete the transaction. *See* Ex. 163 at 14 (detailing deposits from other accounts), 15 (noting an April 15, 2008 check for $220,000.00). Covino contributed $88,000.00 and the remaining $160,000.00 was to be paid in four quarterly payments of $40,000.00 under a promissory note Covino and Aaron, as manager of Hymas Holdings I, signed. *See* Ex. 147.

Prior to purchasing Financial Alliance, Aaron sought the advice of both Turner and Beeman. Both assured Aaron that the Nevada entities were legitimate. While Turner would not opine on the bankruptcy ramifications of such a purchase, he was confident that Hymas Holdings I was a legitimate company that could legally purchase Financial Alliance's stock and take loans from the other Nevada entities to do so. Beeman, as bankruptcy counsel, then blessed the transaction.

MEMORANDUM OF DECISION - 15

Aaron viewed the purchase of Financial Alliance as a means of providing income in the future.  Covino was already licensed to provide financial advice and Aaron planned on obtaining his license soon after bankruptcy was completed.

### B.    Personal bankruptcy

On April 25, 2008, Debtors filed their voluntary petition for chapter 7 relief through Beeman.  Ex. 101.  Despite retaining bankruptcy counsel in late February and commencing the process for filing, Debtors filed a skeletal petition two months later without any schedules or statements.  After filing, Debtors sought and received an extension of time in which to file their schedules and other documents.

On May 21, 2008, Debtors requested a further extension.  In support of this request, Beeman provided an affidavit asserting that on May 13, 2008, he had suffered a serious brain injury, affecting his ability to speak and reason.  *See* Ex. 103.  As such, he could not resume the practice of law immediately.  The Court again granted the extension, setting a June 10, 2008 deadline for Debtors to file their schedules.

On June 11, 2008, Debtors filed their schedules and statement of financial affairs.  *See* Ex. 104.  Despite having had over three months between the time Debtors retained counsel and the time their schedules were ultimately due, Debtors did not focus on compiling the information regarding their assets, income,

MEMORANDUM OF DECISION - 16

transfers and payments until the first week of June.  Then, on June 10, 2008, they

spent approximately twenty hours at Beeman's office completing schedules.  At

that time, Beeman was attempting to complete not only Debtors' schedules but

also Justin and Jackie Walker's schedules.[16]

During the week prior to their meeting and during this twenty-hour session,

Debtors provided Beeman with substantial documents regarding income, assets

and transfers related to themselves and their various entities.  *See* Ex. 186 at Ex. E.

On June 10, 2008, Debtors went through the schedules as they were completed by

Beeman's paralegal.  They questioned where items were placed on the schedules

and how they were disclosed.  Ultimately, they allowed Beeman to determine

what was "income," what constituted a "self-settled trust," what transfers needed

to be disclosed, where and how to disclose the various entities and their values,

and how to list their many real and personal property assets.

Though Debtors initialed each of the over 200 pages before they were filed,

they testified they were not aware of exactly what was filed in their case.  Nor did

Debtors review their schedules and statements again until their July § 341(a)

meeting of creditors.

Notwithstanding the voluminous nature of the documents, Debtors'

---

[16]  As previously noted, the Walkers also filed bankruptcy.  Like Debtors, they filed a
skeletal petition and received serial extensions to file their schedules and statement of financial
affairs.  Their schedules were also due June 10, 2008.  *See* Case No. 08-00804-TLM at Doc. No.
26.

MEMORANDUM OF DECISION - 17

schedules and statement of financial affairs were incomplete and filled with errors.

For example, Debtors listed 165 parcels of real property on Schedule A. They listed substantially all these properties as being held as community property and owned by them in fee simple when, in fact, OPM Enterprises and Crestwood owned the majority of the real property listed. Debtors owned a few of the parcels, but Beeman incorrectly elected to include all 165 on a theory that this was proper because Debtors had guaranteed the debt associated with most of them. They listed the value of all 165 properties as "unknown" and the amount of the secured claims against them as "$0.00." *See* Ex. 104 at 4-21.

On June 25, 2008, the Court ordered Debtors to amend Schedule A to fully and accurately disclose the value of each piece of real property scheduled and the amount of the corresponding secured claim. Ex. 105. On July 17, 2008, Debtors filed amended Schedules A and D and an amended statement of intention. Ex. 106. Debtors reduced (by three) the number of properties listed on Schedule A, but they did not add values or state the amount of secured claims as the Order required. Instead, Beeman elected to amend Schedule D to include the parcel description associated with the secured debt of each listed creditor.

Additional errors can be found in Debtors' Schedule B. The scheduled amount of funds on hand and in bank accounts was inaccurate. Tiffany offered to find out exact amounts in any of the bank accounts, including her STCU account,

MEMORANDUM OF DECISION - 18

but Beeman assured her the exact amount on the date of filing was not necessary.

Debtors questioned this advice, but elected not to include the information Debtors

had available.

In addition, Schedule B lists Debtors' ownership of the Nevada entities but

alleges an "unknown" value as to each. Debtors were aware and easily could have

verified, that on April 25, 2008, the Nevada entities held substantial funds.

Indeed, the Wells Fargo accounts for the Nevada entities held the following

amounts on that date:

| Entity | Checking | Savings |
|---|---|---|
| Hymas Holdings I | $15,012.55 | |
| Hymas Holdings II | $399.03 | $50,033.00 |
| Hymas Holdings III | $383.06 | $75.47 |
| Hymas Holdings IV | $244.38 | |
| Moland Associates | $316.71 | |
| Hymas Ventures, LLLP | $303.36 | |
| Hymas Family Living Trust | $279.81 | |
| Total | $16,938.90 | $50,108.47 |

Thus, the total amount in all the Nevada entities' bank accounts at the time of

filing was $67,047.37. In addition, these entities held other assets which may have

had value.[17] Debtors did not utilize this information and their knowledge to

---

[17] For example, Hymas Holdings I held a number of personal property assets Debtors
had transferred in February. Debtors disclosed those assets on Schedule B, Ex. B and ascribed a
(continued...)

MEMORANDUM OF DECISION - 19

ascribe value to their ownership interests in the Nevada entities.[18]  Nor did they disclose these accounts or their balances – or the transfers that generated those balances – anywhere else in their schedules.

In addition to the foregoing, several questions on Debtors' statement of financial affairs were not completed correctly.  For example, Question 2 on the statement of financial affairs seeking disclosure of income other than from employment, trade, profession, and operation of the debtor's business within two years of filing was marked as "none."  Debtors did not list the over $100,000.00 they received from the sale of the Island Park home.  They rationalized, after discussing the matter with Beeman, that the sale of the Island Park home returned the funds they had invested into the property and had not been deemed a taxable event by their accountant and thus, did not need to be listed.

Question 10a on the statement of financial affairs requires debtors to list "all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within two years immediately preceding the commencement of this case." Beeman and Debtors were aware of the various transfers to the Nevada entities

---

[17] (...continued)
$12,060.00 value to those items.  *See* Ex. 104.  However, like the account balances, Debtors did not utilize those calculated values to estimate a value for the entity in their schedules.

[18]  The "value" of Debtors' ownership interest in the entities would require consideration of those entities' assets (here primarily infused cash) and liabilities.  Other than references to some intra-entity "loans," no evidence was presented to suggest the existence of any liabilities.

MEMORANDUM OF DECISION - 20

prior to filing the schedules (and certainly the large number of substantial transfers from February through April) and the depletion of Debtors' investment accounts, but Beeman deemed the many transfers properly disclosed elsewhere in the schedules. Beeman decided to mark the "none" box for this question. Debtors questioned Beeman about this choice not to list any transfers on Debtors' statement of financial affairs. Beeman inaccurately assured Debtors that the entities and accounts were disclosed elsewhere, and he compounded the error by claiming that because of those other disclosures, the transfers did not need to be listed under Question 10a.

Although Debtors provided a list of transfers and accounts to Beeman, they did not confirm that the transfers and accounts were adequately disclosed in their schedules. Instead, they elected to sign the schedules and statement knowing that Question 10(a) claimed they had transferred no property within two years of filing bankruptcy. Beeman admitted that not listing those transfers on Question 10(a) was his mistake (Adv. Doc. No. 60 at 91), but Debtors signed their schedules under penalty of perjury and knew that question was not accurately answered.

Question 10(b) of the statement of financial affairs requires debtors to list "all property transferred by the debtor within ten years immediately preceding the commencement of this case to a self-settled trust or similar device of which the debtor is a beneficiary." Debtors were aware that they were beneficiaries of the Hymas Family Living Trust, and they were aware of the $23,000.00 they

MEMORANDUM OF DECISION - 21

transferred into it after its December 2007 formation and February 2008 restatement. When Beeman proposed marking the box "none" in response to that question, Aaron questioned the veracity of that response. Beeman explained that their trust did not fall within the definition of a self-settled trust. Beeman made that determination after searching the Internet for a definition of the term but without reviewing Debtors' trust documents. Debtors did not discuss the issue further and, ultimately, claimed in their signed statement of financial affairs they had not transferred any property into a self-settled trust.

The errors listed above are but a few of those found in Debtors' schedules and statement of financial affairs. Such errors were not corrected to accurately reflect assets, values, income or transfers.[19]

### C.    Section 341(a) creditors' meeting

Prior to attending their July 25, 2008 § 341(a) meeting of creditors, Debtors observed the Walkers' § 341(a) meeting and the contentious disputes that arose between the Walkers' trustee and Beeman. After viewing that meeting, they were aware of the need for candid and full disclosure with their trustee.

The chapter 7 trustee in Debtors' case, Richard Crawforth ("Trustee"), and his attorney, Jed Manwaring, conducted Debtors' § 341(a) meeting. They

---

[19] Debtors had ample opportunity to amend their schedules and statement of financial affairs, including after Beeman was replaced by new counsel. Although Debtors amended schedule A on June 7, 2010, two days before the trial in this adversary proceeding commenced (*see* Case No. 08-00802-TLM at Doc. No. 217), the majority of the errors were never corrected.

MEMORANDUM OF DECISION - 22

inquired into the various Nevada entities.  In response, Aaron drew a schematic of

the entities, explained the entity structure, and described what each owned.  Aaron

discussed the sale of the Island Park home, the transfers into the Nevada entities,

and the $220,000 used to purchase a 50% interest in Financial Alliance.

Manwaring also inquired into the amount of cash held by Debtors or their entities

at the time bankruptcy was filed.  At the conclusion of the meeting, Trustee's

counsel advised Debtors not to transfer or use money from the Nevada entities.[20]

### D.      Post § 341(a) meeting events

Although Aaron indicated a willingness to cooperate at the § 341(a)

meeting, Beeman advised Debtors not to turn over any money from the Nevada

entities to the Trustee.  In August, Aaron and Beeman met with Manwaring, where

again Beeman resisted giving any of the Nevada entities' assets to the Trustee.

Manwaring explained the concept of fraudulent conveyances and that the Trustee

could seek to have the Court deny Debtors' discharge under § 727 for attempting

to hinder, delay or defraud creditors.  Aaron thereafter attempted to contact

Manwaring personally but, because Debtors were represented, Manwaring could

---

[20]  Up until that time, Debtors had continued to operate their entities and move money
and assets between the entities and themselves.  For example, after bankruptcy on July 7, 2008,
Tiffany caused Hymas Holdings I to quitclaim Debtors' home on Sugar Loaf Way back to
Tiffany as her sole and separate property so Debtors could effect a "short sale" to their friend and
business partner, Vince Covino.  *See* Ex. 144.  This effort was stymied when, after Debtors tried
to assert a homestead exemption and obtain abandonment of the real property, the pre- and post-
bankruptcy quitclaim deeds came to light.  In addition, the funds in the Hymas Holdings I
account and the Hymas Family Living Trust account were used to pay Debtors' bills and living
expenses.

MEMORANDUM OF DECISION - 23

not communicate with him.

Debtors then terminated Beeman's employment, and Aaron met with Manwaring without counsel.  At that meeting, Manwaring confirmed many of the errors in Debtors' schedules and statement of financial affairs.  He explained Trustee's position that all funds then in the Nevada entities' accounts were property of the estate.[21]  Aaron did not immediately agree to turn over those funds, but instead sought new counsel to confirm Manwaring's assertion that Debtors were required to relinquish control over the cash in the Nevada entities' bank accounts.  After Aaron left that meeting, he located and retained new counsel, Brent Robinson.

In early October, 2008, Debtors delivered funds from the Nevada entities' bank accounts to the Trustee.  Tiffany initially deposited all funds into the Hymas Family Living Trust account and had one check issued to Trustee for $51,963.74.  However, Trustee requested a check from each account and proof of zero balances.  In response, Tiffany provided, on behalf of each entity, checks to Trustee in the following amounts:

---

[21]   Trustee's position makes sense.  However, the cash *then* held by the Nevada entities would appear to represent only a small portion of the potential assets for the estate.  It is unclear what Trustee's position was at that time as to all of Debtors' property and cash transferred into the Nevada entities in the year preceding filing, which was of course significantly greater than the cash remaining at the time of filing or the time of the meeting.  *See also infra* note 23.

MEMORANDUM OF DECISION - 24

| Entity | Amount |
|---|---|
| Hymas Holdings I | $0.00 |
| Hymas Holdings II | $39,465.71 |
| Hymas Holdings III | $140.00 |
| Hymas Holdings IV | $3,134.67 |
| Moland Associates | $2,875.00 |
| Hymas Ventures, LLLP | $396.86 |
| Hymas Family Living Trust | $5,951.50 |
| TOTAL | $51,963.74 |

*See* Ex. 182 at Ex. D, p. 33 (a summary of all account balances and Trustee

payments); Ex. 159 (containing some but not all of the checks received by

Trustee); Ex. 164 at 32; Ex. 165 at 32; Ex. 170 at 29; Ex. 168 at 23; Ex. 166 at 29;

Ex. 167 at 47.[22]  While the evidence indicates Debtors had cash assets of

$67,047.37 in the Nevada entities' bank accounts on the date of filing, Trustee

recovered only the $51,963.74 remaining as of early October.[23]

---

[22]  The Trustee agreed, contingent upon proper documentation, that $10,000.00 of the funds on hand were not Debtors' property as that amount stemmed from a lawsuit settlement for one of Debtors' children.

[23]  Even assuming the $10,000.00 in settlement funds was in one of the accounts on the date of filing, something not proven by the evidence presented, there is still a $5,083.63 difference between what Trustee collected and what Debtors' entities possessed on the date of filing.  And, while Trustee sought collection of the cash assets in the Nevada entities as of fall, 2008, nothing in the record reflects his analysis of the April 25, 2008 petition-date value of Debtors' ownership interests in the Nevada entities, or through such entities, in Financial Alliance, Equity Benefits, or OPM Enterprises.  On December 1, 2008, Trustee sold a baby grand piano *and* all of the Nevada entities back to the Debtors for $3,000.00.  Ex. 109.  Trustee sold those entities even though – on the present record – he had done nothing to administer Hymas Holdings I's stock interest in Financial Alliance, a company still in business today, nor Hymas

(continued...)

MEMORANDUM OF DECISION - 25

On November 4, 2008, after Manwaring obtained the funds from Tiffany, he wrote a letter to the UST informing the UST that Debtors had cooperated in turning over the cash assets but that Trustee had experienced difficulties with Debtors' prior counsel, Beeman.  Ex. 160.

On November 14, 2008, the UST initiated this adversary proceeding seeking to deny Debtors a discharge under § 727(a)(2), (a)(4) and (a)(6).

## DISCUSSION AND DISPOSITION

The Ninth Circuit Court of Appeals recently stated:

> Those objecting to discharge "bear[ ] the burden of proving by a preponderance of the evidence that [the debtor's] discharge should be denied." *Khalil v. Developers Sur. & Indem. Co. (In re Khalil)*, 379 B.R. 163, 172 (B.A.P. 9th Cir. 2007), *aff'd*, 578 F.3d 1167, 1168 (9th Cir. 2009) (expressly adopting the BAP's statement of applicable law). "In keeping with the 'fresh start' purposes behind the Bankruptcy Code, courts should construe § 727 liberally in favor of debtors and strictly against parties objecting to discharge." *Bernard v. Sheaffer (In re Bernard)*, 96 F.3d 1279, 1281 (9th Cir. 1996).  This does not alter the burden on the objector, but rather means that "actual, rather than constructive, intent is required" on the part of the debtor.  *In re Khalil*, 379 B.R. at 172. When factual findings are based on determinations regarding the credibility of witnesses, we give great deference to the bankruptcy court's findings, because the bankruptcy court, as the trier of fact, had the opportunity to note "variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and

---

[23] (...continued)
Holdings III's interest in OPM Enterprises, nor Hymas Ventures, LLLP's interest in Equity Benefits.  Therefore, those various partnership, member and/or stock interests still appear to be owned by the Nevada entities.  Notwithstanding the fact that Debtors have now purchased the estate's interest in the Nevada entities, Aaron testified that he believed such interests and whatever value they held were still assets of the bankruptcy estate.  Inasmuch as today's Decision addresses only the question of discharge, the Court will reach no conclusions nor make further comment on Trustee's administration of assets.

MEMORANDUM OF DECISION - 26

belief in what is said." *Anderson v. City of Bessemer City,* 470 U.S.
564, 575 (1985).

*Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010).

## A.    11 U.S.C. § 727(a)(2)(A)[24]

A party seeking denial of discharge under § 727(a)(2) must prove
two things: "(1) a disposition of property, such as transfer or
concealment, and (2) a subjective intent on the debtor's part to
hinder, delay or defraud a creditor through the act [of] disposing of
the property." *Hughes v. Lawson (In re Lawson)*, 122 F.3d 1237,
1240 (9th Cir. 1997).

*In re Retz*, 606 F.3d at 1200.

The facts of this case have been stated in detail above.  To name but a few

of the more significant transfers made by Debtors: Tiffany transferred

$325,000.00 in three separate transactions from her STCU account to Hymas

Holdings I (Ex. 178 at 9; Ex. 163 at 8),  Hymas Holdings II (Ex. 178 at 9; Ex. 164

at 12), and Hymas Holdings III *(*Ex. 178 at 9; Ex. 165 at 10); $7,000.00 from her

STCU account to Moland Associates (Ex. 178 at 15; Ex. 168 at 9); and ownership

of Debtors' home on Sugar Loaf Way to Hymas Holdings I (Ex. 143).

---

[24]  Section 727(a)(2)(A) states:

(a)  The court shall grant the debtor a discharge, unless--

   (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer
of the estate charged with custody of property under this title, has transferred,
removed, destroyed, mutilated, or concealed, or has permitted to be transferred,
removed, destroyed, mutilated, or concealed--

    (A) property of the debtor, within one year before the date of the filing of
the petition[.]

MEMORANDUM OF DECISION - 27

While Debtors admit that these transfers occurred within the one-year period applicable to § 727(a)(2)(A), they dispute that they were made with the intent to hinder, delay or defraud creditors.  It should be noted, however, that

> [a] debtor's intent need not be fraudulent to meet the requirements of § 727(a)(2). Because the language of the statute is in the disjunctive it is sufficient if the debtor's intent is to hinder or delay a creditor. *In re Bernard*, 96 F.3d at 1281. Furthermore, "lack of injury to creditors is irrelevant for purposes of denying a discharge in bankruptcy." Id. at 1281-82 (quoting *In re Adeeb*, 787 F.2d at 1343).

*Retz*, 606 F.3d at 1200.

Debtors assert they transferred their assets into legitimate entities based on the advice of counsel without any intent to file bankruptcy.[25]  However, Turner's advice regarding the creation of legitimate Nevada entities, and the funding of the same in order for them to transact business, cannot shield Debtors from the problems created from a wholesale transfer of their assets to those entities for no consideration, leaving their then-existing personal creditors without recourse to assets.  Recall, as the transfers were being made and the entities funded in February, March and April 2008, Debtors were subject to numerous liens, lawsuits and even judgments.  And, in the latter part of February, they had already retained counsel to assist in filing personal bankruptcy.  The Court finds Debtors made their many transfers with, at a minimum, the intent to hinder or delay creditors.

---

[25]  Debtors had not retained Beeman prior to February 25, 2008.  Therefore, any legal advice provided, prior to February 25, 2008, necessarily came from Turner.

MEMORANDUM OF DECISION - 28

Given the timing and the evidence of ongoing aggressive collection activity, such

a conclusion is inescapable.

But were the transfers completed with the intent to defraud creditors?

In examining the circumstances of a transfer under
§ 727(a)(2), certain "badges of fraud" may support a finding of
fraudulent intent.

> These factors, not all of which need be present, include
> (1) a close relationship between the transferor and the
> transferee; (2) that the transfer was in anticipation of a
> pending suit; (3) that the transferor Debtor was
> insolvent or in poor financial condition at the time; (4)
> that all or substantially all of the Debtor's property was
> transferred; (5) that the transfer so completely depleted
> the Debtor's assets that the creditor has been hindered
> or delayed in recovering any part of the judgment; and
> (6) that the Debtor received inadequate consideration
> for the transfer.

*Emmett Valley Assocs. v. Woodfield (In re Woodfield)*, 978 F.2d 516,
518 (9th Cir. 1992).

*Retz*, 606 F.3d at 1200.  Here, virtually all of the badges of fraud are present and a

finding of an intent to defraud creditors is supported.  The transfers were made to

closely-held entities; the transfers were made after various lawsuits had been filed

and in close proximity to the Bank of the West lawsuit; Debtors transferred

substantially all of their assets; the transfers depleted Debtors' assets such that the

banks and other creditors would be hindered or delayed in recovering on their

judgments; and Debtors received no consideration for the transfers.

Debtors' rationalization that they were acting under the advice of counsel

MEMORANDUM OF DECISION - 29

with no intent to file bankruptcy or hinder or harm creditors is belied by the circumstances. Even Aaron stated that he would "be a fool to tell you" that he did not have the possibility of financial ruin in mind when Debtors established the Nevada entities and transferred their assets. Ex. 185 at 131. Debtors were aware that lawsuits and judgments were pending against them individually when Debtors transferred all of their assets out of their individual names.[26] Aaron was preparing to start new businesses because he knew Crestwood's viability was perilous, and Debtors knew Crestwood was in serious distress as Tiffany was moving substantially all of Debtors' funds into the Nevada entities' bank accounts.[27]

Aaron heard Malis state at the asset protection seminar that he could "own nothing but control everything" and he adopted this mantra as his own. Given the sheer volume of the accounts created and the transactions made in a short amount of time, it is clear Tiffany spent large portions of her days dealing with the financial aspects of accomplishing this goal. She, like Aaron, understood the significance of what she was doing, and of the pressures from the failed business and creditor collections while she was doing it. In short, Debtors were transferring their assets in order to keep them and their value and to continue earning income,

---

[26] This also included the transfer of personal property and household goods into Hymas Holdings I. That only the potentially "exempt" assets were transferred back to Debtors before filing is telling.

[27] The Court also concludes, upon the entirety of the record, that Debtors knew at the time Tiffany transferred their residence by quitclaim deed that the Building Components' covenant not to record judgment was scheduled to expire.

MEMORANDUM OF DECISION - 30

knowing and intending that this would be done at the expense of their creditors.

In summary, the Court finds that in order to protect their real and personal property assets, Debtors intended to and did place them in the Nevada entities and they believed, beyond the reach of their individual creditors. The circumstances surrounding Debtors' finances, Crestwood's continuing losses, and the extent and timing of these transfers, evidences the necessary intent to hinder, delay or defraud creditors. Debtors' rationalizations and excuses to the contrary are not convincing.

Debtors' discharge will therefore be denied under § 727(a)(2)(A).

## B.     11 U.S.C. § 727(a)(4)(A)

The UST also seeks denial of discharge under § 727(a)(4). Though Debtors' discharge will be denied under § 727(a)(2)(A), the Court will also address this cause of action.

Section 727(a)(4)(A) states: "The court shall grant the debtor a discharge, unless ... the debtor knowingly and fraudulently, in or in connection with the case[,] made a false oath or account." 11 U.S.C. § 727(a)(4)(A). "A false statement or an omission in the debtor's bankruptcy schedules or statement of financial affairs can constitute a false oath." *In re Khalil*, 379 B.R. at 172. "The fundamental purpose of § 727(a)(4)(A) is to insure that the trustee and creditors have accurate information without having to conduct costly investigations." FN6 Id. (quoting *Fogal Legware of Switz., Inc. v. Wills (In re Wills)*, 243 B.R. 58, 63 (B.A.P. 9th Cir. 1999)).

To prevail on this claim, a plaintiff must show, by a preponderance of the evidence, that: "(1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3)

MEMORANDUM OF DECISION - 31

the oath was made knowingly; and (4) the oath was made fraudulently." *Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 882 (B.A.P. 9th Cir. 2005) (citing *In re Wills*, 243 B.R. at 62). A finding of fraudulent intent is a finding of fact reviewed for clear error. *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1342 (9th Cir. 1986).

*Retz,* 606 F.3d at 1196-97.

## 1.    False Oath

The UST must first prove the existence of a false oath in connection with the bankruptcy case. *Retz*, 606 F.3d at 1197 (citing *In re Roberts*, 331 B.R. at 882). Errors and omissions in a debtor's schedules and statement of financial affairs can qualify as false oaths under § 727(a)(4)(A). *See In re Khalil*, 379 B.R. at 172.

Here, the facts clearly show Debtors made false oaths in their bankruptcy schedules and statement of financial affairs. Debtors made multiple transfers that were not disclosed on Question 10(a) in their statement of financial affairs. In addition, they transferred funds into their self-settled family trust and did not disclose those transfers on Question 10(b). Debtors' schedules were riddled with errors and omissions regarding the value of Debtors' interests in the Nevada entities and in their bank accounts and omitted disclosure of income from the sale of the Island Park home.

MEMORANDUM OF DECISION - 32

### 2.    Material

As *Retz* notes,

> Section 727(a)(4)(A) requires that the relevant false oath relate to a material fact. *In re Roberts*, 331 B.R. at 882; *see also* 11 U.S.C. § 727(a)(4)(A). "A fact is material 'if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property.'" *In re Khalil*, 379 B.R. at 173 (quoting *In re Wills*, 243 B.R. at 62). An omission or misstatement that "detrimentally affects administration of the estate" is material. *In re Wills*, 243 B.R. at 63 (citing 6 Lawrence P. King et al., Collier on Bankruptcy ¶ 727.04[1][b] (15th ed. rev. 1998)).

*Retz*, 606 F.3d at 1198. Here, Debtors' errors and omissions relate to the existence and disposition of Debtors' property, their business dealings and their estate. These types of errors and omissions impede the Trustee's ability to analyze and administer assets of the estate and did so here. Therefore, Debtors' errors were material.

### 3.    Knowledge

Section 727(a)(4)(A) requires the Court find a debtor acted knowingly in making the false oath. *In re Roberts*, 331 B.R. at 882; *see also* 11 U.S.C. § 727(a)(4)(A). "A debtor 'acts knowingly if he or she acts deliberately and consciously.'" *In re Khalil*, 379 B.R. at 173 (quoting *In re Roberts*, 331 B.R. at 883). Here, Debtors were aware that their schedules and statement of financial affairs lacked accurate disclosures. Notwithstanding this knowledge, they declared under penalty of perjury that their schedules and statement of financial

affairs were accurate. The Court finds Debtors had knowledge of the falsity.[28]

### 4.    Fraudulent Intent

In addressing the fourth element, fraudulent intent, *Retz* stated:

> To demonstrate fraudulent intent, [Plaintiff] bore the burden of showing that: "(1) [debtor] made the representations [e.g., a false statement or omission in bankruptcy schedules]; (2) . . . at the time *he knew they were false*; [and] (3) . . . he made them with the *intention and purpose of deceiving the creditors*." *In re Khalil*, 379 B.R. at 173 (quoting *In re Roberts*, 331 B.R. at 884) (second and third alterations in original). Intent is usually proven by circumstantial evidence or by inferences drawn from the debtor's conduct. *Devers v. Bank of Sheridan, Mont. (In re Devers)*, 759 F.2d 751, 753-54 (9th Cir. 1985); *see also In re Roberts*, 331 B.R. at 884. Reckless indifference or disregard for the truth may be circumstantial evidence of intent, but is not sufficient, alone, to constitute fraudulent intent. *In re Khalil*, 379 B.R. at 173-75.

*Retz*, 606 F.3d at 1198-99. Debtors claim they lacked the fraudulent intent required under § 727(a)(4). Instead, they argue that they hired experienced bankruptcy counsel, Beeman, and relied on his advice to complete their schedules. They provided him information regarding the establishment and funding of the Nevada entities, the sale of assets, and transfers of property, and testified they relied upon him to properly disclose those transactions.

> "Generally, a debtor who acts in reliance on the advice of his attorney lacks the intent required to deny him a discharge of his debts." *In re Adeeb*, 787 F.2d at 1343. "However, the debtor's reliance must be in good faith." *Id*. The advice of counsel is not a defense when the erroneous information should have been evident to the debtor. *Boroff v.*

---

[28] Debtors' argument of reliance on counsel is urged in connection with knowledge as well as fraudulent intent, but it is addressed below in connection with the fourth element.

MEMORANDUM OF DECISION - 34

> *Tully (In re Tully)*, 818 F.2d 106, 111 (1st Cir. 1987). "A debtor cannot,
> merely by playing ostrich and burying his head deeply enough in the
> sand, disclaim all responsibility for statements which he has made under
> oath." *Id.*

*Retz*, 606 F.3d at 1199.

This element is the most problematic of those required under

§ 727(a)(4)(A). Beeman's advice and conduct was patently wrong in numerous

regards. Yet the question presented is not simply one of his poor and inadequate

performance, it is of Debtors' good faith in relying on his advice and counsel.

Beeman's testimony regarding his advice to Debtors differed from Debtors'

testimony.[29] Beeman did admit that he decided whether to disclose transfers, how

and where to disclose assets and how to address valuation. Beeman did not, as

bankruptcy counsel, analyze or instruct Debtors as to the ramifications of

establishing the Nevada entities prior to filing bankruptcy.[30] However, Beeman

did counsel Debtors to continue funding those Nevada entities, transferring funds

between entities and disposing of potential estate assets. Beeman did not explain

---

[29] In comparing the witnesses' testimony, the Court finds Debtors' account of their
discussions and interactions with Beeman to be more credible than Beeman's. But that is not to
say, however, that the Court finds Debtors' testimony to be consistently credible. Debtors often
gave non-responsive or qualified answers when examined by the UST, especially in regard to the
transfers of their assets into the Nevada entities, and their opinions as to the accuracy of their
bankruptcy documents or the integrity of their actions. However, between Beeman's and
Debtors' accounts, the Court concludes Debtors gave the more accurate description of the
representation and advice provided by Beeman, and Beeman's testimony was, in many instances,
impeached by his own deposition testimony.

[30] Beeman did not question or independently research the viability of the Nevada
entities. Instead, he relied on Turner's analysis that they were legitimate.

MEMORANDUM OF DECISION - 35

to Debtors how doing so might give rise to fraudulent or otherwise avoidable

transfers or nondischargeability proceedings.  Instead, he assured Debtors that the

worst that would happen regarding the Nevada entities would be that the Court

would "unwind" the transactions.[31]

On one hand, Debtors provided Beeman with the information needed to

accurately complete the schedules; they did not fail to disclose their assets,

transfers or income to their attorney.  In addition, Debtors consistently testified

that, when they questioned Beeman regarding how the schedules were to be

completed, they received rationales for the approach Beeman had taken in the

schedules, assurances that the information was disclosed elsewhere, and

definitions of terms such as income and self-settled trust seemingly supporting

Beeman's analysis and decisions in completing the schedules.

On the other hand, Debtors are intelligent.  As already noted, they went to

great lengths to protect their assets from creditors and desired to continue to

protect those assets throughout the bankruptcy process.  Although Debtors

questioned how the schedules were completed and admitted they were unsure of

the accuracy at the time they were drafted, they did not insist on correcting

obvious errors and omissions.

---

[31]  Some of this advice was provided prior to Beeman's stroke, which impaired his ability
to reason and perform the duties of, and function as, counsel.  However, much of Beeman's
advice regarding the completion of schedules and disclosures was provided after that medical
event.

MEMORANDUM OF DECISION - 36

Because Debtors received direct advice from their bankruptcy counsel condoning the errors and omissions in their schedules, however patent, determining whether Debtors possessed the necessary intent is difficult.  However, weighing the testimony and other evidence, the Court concludes the UST carried its burden on the issue.  Though Beeman's advice was wrong and unsupportable, the Court concludes Debtors, rational and intelligent individuals, knew that the disclosures and answers provided in their schedules and statements were incomplete and inaccurate notwithstanding that advice.  Therefore, Debtors could not rely on Beeman's advice in good faith, and their protestations that they did so were not credible.  They possessed the requisite fraudulent intent, and their discharge will also be denied under § 727(a)(4).[32]

## CONCLUSION

Debtors' discharge will be denied under § 727(a)(2)(A) and § 727(a)(4)(A) based on their transfer of assets within a year of filing

---

[32] Having determined Debtors' discharge will be denied under § 727(a)(2) and (4), the Court concludes that a lengthy discussion of the UST's remaining § 727(a)(6) cause of action is unnecessary.  In summary, the Ninth Circuit has determined that "it is totally within the discretion of the bankruptcy court to find a particular violation of the court's order so serious as to require denial of discharge under § 727(a)(6)(A)." *In re Devers*, 759 F.2d 751, 755 (9th Cir.1985).  Here, Debtors failed to *adequately* amend Schedule A and thus did not comply with this Court's order to amend that schedule.  However, Debtors did file an amendment.  Having reviewed the record, the Court concludes Debtors' failure to adequately comply with the order was not a refusal to follow the Court's order in a manner that would support denial of discharge.  *See In re Walter*, 265 B.R. 753, 758 (Bankr. D. Ohio 2001) (discussing the difference between a refusal and a failure to comply with a court order).  Therefore, the UST's § 727(a)(6) cause of action will be dismissed.

MEMORANDUM OF DECISION - 37

bankruptcy with the intent to hinder, delay or defraud their creditors and

their knowing and fraudulent false oaths in connection with their case.

The UST shall provide an appropriate form of judgment consistent

with this Decision.

DATED:  September 30, 2010

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 38